1  McCormick, Barstow, Sheppard,
Wayte & Carruth LLP
2  James P. Wagoner, #58553
  *jim.wagoner@mccormickbarstow.com*
3  Lejf E. Knutson, #234203
  *lejf.knutson@mccormickbarstow.com*
4  7647 North Fresno Street
Fresno, California 93720
5  Telephone:    (559) 433-1300
Facsimile:    (559) 433-2300
6
Attorneys for Plaintiffs FreshPac, LLC; Dayka &
7  Hackett, LLC; Kool Kountry, LLC; Hackett AG
Management, Inc.; Fresh Select, LLC; and TM
8  Diversified, Inc. on behalf of Dayka Ag
Management, Inc.
9

10                UNITED STATES DISTRICT COURT

11        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

12

13
FRESHPAC, LLC; DAYKA & HACKETT,          Case No.
14  LLC; KOOL KOUNTRY, LLC; HACKETT
AG MANAGEMENT, INC.; FRESH               **COMPLAINT FOR INSURANCE**
15  SELECT, LLC; and TM DIVERSIFIED        **BREACH OF CONTRACT AND BREACH**
MANAGEMENT, INC. on behalf of DAYKA      **OF THE IMPLIED COVENANT OF**
16  AG MANAGEMENT, INC.                    **GOOD FAITH AND FAIR DEALING**

17          Plaintiffs,

18          v.                             *****

19  AMRITSAR INSURANCE COMPANY; and        **DEMAND FOR TRIAL BY JURY**
Does 1-100,
20
          Defendants.
21

22

23

24

25

26

27

28

Plaintiffs FreshPac, LLC; Dayka & Hackett, LLC; Kool Kountry, LLC; Hackett AG Management, Inc.; Fresh Select, LLC; and TM Diversified Management, Inc. on behalf of Dayka AG Management, Inc. (the "Insured Entities") bring this Complaint against Defendant Amritsar Insurance Company ("Amritsar") and allege as follows:

## JURISDICTION

### Subject Matter Jurisdiction - Amount In Controversy

1.    The jurisdiction of the Court is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

2.    This is a civil action in which the matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs for purposes of 28 U.S.C. § 1332(a).  As set forth below, Amritsar's potential liability for losses subject to indemnification under a series of Tax Audit Expenses (Reimbursement) Policies which it issued to the Insured Entities for the successive policy periods of December 13, 2017 – 2018, December 13, 2018 – 2019 and December 13, 2019 – 2020 (the "Policies") exceeds the $75,000 jurisdictional limit.

### Subject Matter Jurisdiction – Diversity

3.    FreshPac, LLC ("FreshPac") is a Delaware limited liability company with its principal place of business located in Reedley, California.

4.    Dayka & Hackett, LLC, is a California limited liability company with its principal place of business located in Reedley, California.

5.    Kool Kountry, LLC, is a California limited liability company with its principal place of business located in Reedley, California.

6.    Hackett AG Management, Inc., is a California corporation with its principal place of business located in Clovis, California.

7.    Fresh Select, LLC, is a California limited liability company with its principal place of business located in Dinuba, California.

8.    TM Diversified Management, Inc. is a Kentucky corporation with its principal place of business located in Versailles, Kentucky.  TM Diversified Management, Inc. is the successor in interest to the insured entity Dayka Ag Management, Inc., former California corporation with its

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

1  principal place of business located in Clovis, California.

2      9.      Defendant Amritsar is a corporation which is incorporated under the laws of the State

3  of Utah with its principal place of business in Park City, Utah.

4      **Personal Jurisdiction**

5      10.      The Insured Entities each qualify as insureds under the Policies which, as indicated

6  by the certificates of insurance issued in conjunction with the Policies, were delivered to the Insured

7  Entities at their principal places of business in Reedley, Clovis and Dinuba, California.

8      11.      The losses suffered by the Insured Entities for which they seek corresponding policy

9  benefits were incurred by the Insured Entities at their principal places of business in Reedley, Clovis

10  and Dinuba, California.

11      12.      The Court has personal jurisdiction over Amritsar due to its having issued the subject

12  Policies to the Insured Entities who are domiciled in the State of California such that Amritsar has

13  sufficient minimal contacts with California that the maintenance of this suit in this District does not

14  offend traditional notions of fair play and substantial justice.  *See Int'l Shoe Co. v. State of Wash.,*

15  *Off. of Unemployment Comp. & Placement,* 326 U.S. 310, 315 (1945); *Will Co. v. Lee*, 47 F.4th 917,

16  922 (9th Cir. 2022).

17  **VENUE**

18      13.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part

19  of the events or omissions giving rise to the claim occurred in the District and defendant Amritsar

20  is subject to the personal jurisdiction of the Court with respect to this Action.  Specifically, Amritsar

21  issued the Policies to the Insured Entities at their principal places of business located in Reedley,

22  Clovis and Dinuba, California, and also breached its obligations thereunder in Reedley, Clovis and

23  Dinuba, California by actions including, but not limited to, breaching its contractual obligations to

24  provide the Insured Entities with all benefits due and owing under the Policies at their principal

25  places of business in Reedley, Clovis and Dinuba, California.

26      14.      The Policies purport to be governed by Utah law.  (See Form [01/18/17], Sec.K(3)

27  ["This Policy shall be construed under the laws of the State of Utah."].)    Under the Policies'

28  "Jurisdiction in the State of Utah" provision, the Policies further state "[t]he sole venue for any

3

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

'Claim' or dispute concerning the application or interpretation of the terms of this Policy, or any matter arising therefrom, shall be tried solely in the State of Utah, under its laws, which the Court shall apply." (*Id.*)  Under Utah law following the Second Restatement of Conflict of Laws, Section 80, a forum selection clause such as the one contained in the Policies will not be given effect in situations where to do so would be "unfair or unreasonable."  *Energy Claims Ltd. v. Catalyst Inv. Grp. Ltd.*, 2014 UT 13, ¶47 (Utah 2014) (citing RESTAT. 2ND OF CONFLICT OF LAWS §80 (Supp.1988)); *see also Prows v. Pinpoint Retail Sys., Inc.,* 868 P.2d 809, 812 (Utah 1993).  As applied in the present case, to force the Insured Entities to bring their case in Utah would "be [so] gravely difficult and inconvenient that [the Insured Entities] will for all practical purposes be deprived of [their] day in court."   *Prows,* 868 P.2d 809, 812 (citing *M/S Bremen v. Zapata Off-Shore Co*., 407 U.S. 1, 17 (1972).)  This "grave difficulty and inconvenience" is shown by the fact that: (1) none of the Insured Entities are citizens of, are domiciled in or otherwise do business in Utah; (2) all losses incurred by the Insured Entities which are subject to reimbursement under the Policies were incurred in Fresno and Tulare Counties and arose out of IRS proceedings venued in Fresno County; (3) the overwhelming bulk of evidence relevant to this insurance dispute including relevant witnesses and documentary evidence is located in Fresno County. *See* RESTAT. 2ND OF CONFLICT OF LAWS §80, cmt.c ("A court will likewise entertain the action if it finds that the chosen state would be so seriously an inconvenient forum that to require the plaintiff to bring suit there would be unjust."); (4) the forum selection clauses are part contracts of adhesion consisting of the Policies such that the forum selection clauses were not freely negotiated between Amritsar and the Insured Entities or entered into by the Insured Entities.  *See id.* ("Relevant in this connection … would be the fact that the provision was contained in an adhesion or take-it-or-leave-it contract whose provisions the party bringing the action was compelled to accept without argument or discussion."); and (5) Utah has no "substantive relationship" with this dispute or other "interest in" having this dispute venued in Utah. *See Rutherford ex rel. Rutherford v. Talisker Canyons Fin. Co., LLC,* 2014 UTApp 190, ¶24*, aff'd and remanded sub nom. Rutherford v. Talisker Canyons Fin., Co., LLC,* 2019 UT 27, ¶24 (holding state of domicile of party preparing release with choice of law provision in favor of that state did not, in fact, have any "substantial relationship" or "interest in "

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

in the dispute where the other parties to the dispute were domiciled in another state and were injured in that other state); *In re Mountain W. Indus., LLC*, 583 B.R. 514, 522 (Bankr. D. Utah 2018) (interpreting Utah law and holding choice of law provisions are unenforceable insofar as they "involve the selection of a state that [does not have] 'a 'substantial relationship' or 'interest in' the parties or the transaction before us.'") (citing *Rutherford,* 2014 UTApp 190, ¶24.) These facts showing that enforcement of the Policies' forum selection clause would be "unfair and unreasonable" under the present circumstances are sufficient to *prima facie* establish that the Policies' forum selection clauses are unenforceable and that venue is proper in this District.  *See Energy Claims Ltd.,* 2014 UT 13, ¶¶51-53 (adopting view that sufficiently plead allegations indicating that contract's forum selection clause was unenforceable under the RESTAT. 2ND OF CONFLICT OF LAWS §80 was sufficient to avoid application of the forum selection claims at the pleadings stage).

15.    The Policies purport to be subject to an "Arbitration" provision providing, in relevant part, that "[a]ny dispute which arise between the 'Insurer' and an 'Insured' shall, by written request to the other party, be submitted to an informal dispute settlement procedure held in the State of Utah." (See Form [01/18/17], Sec.K(8).)   However, insofar as the Policies purport to be governed by Utah law  (*id.*, Sec.K(3)), the Policies are thereby governed by the applicable Utah Department of Insurance Regulations (hereinafter "the Utah Regulations.")  Under the Utah Regulations, for the Policies' arbitration provision to be enforceable, it "must [have] been disclosed prior to the execution of the insurance contract between the insurer and the policy holder…."  Utah R590-122-4(5).  However, in this instance, Amritsar did not disclose the Policies' "Arbitration" provision "prior to the execution of the insurance contract" such that it is unenforceable.

16.    Alternatively, as assuming for sake of argument that the Policies' "Arbitration" provision was disclosed to the Insureds Entities as required by Utah R590-122-4(5), the Utah Regulations further provide that "[n]o arbitration provision may require that arbitration be held at a place further from the residence of the insured than the nearest location of a State Court of General Jurisdiction."  Utah R590-1 22-4(9).  Consequently, in the event the Policies' "Arbitration" provision is generally enforceable in connection with this dispute, that part of the "Arbitration"

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

5

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

1    provision purportedly requiring arbitration in the "State of Utah" is invalid and unenforceable.

2    Moreover, the fact that the Utah Department of Insurance, as evidenced by the Utah Regulations,

3    has determined that it is against Utah public policy to force non-resident insureds to submit to

4    arbitration in the State of Utah further demonstrates that it would be "unfair or unreasonable" to

5    force the Insured Entities to litigate this dispute in Utah based on the mere fact that the Insured

6    Entities have not exercised their purported right to arbitrate this dispute with Amritsar. *See* RESTAT.

7    2ND OF CONFLICT OF LAWS §80; *Rutherford,* 2014 UTApp 190, ¶24; *In re Mountain W. Indus., LLC*,

8    583 B.R. 514, 522.

9    **NATURE OF THE CASE**

10            **The Insurance Policies**

11            17.    Beginning in 2012, the Insured Entities via their principals, officers and/or

12    predecessors in interest, organized separate 831(b) captive insurance companies under the names

13    TMAK Insurance, Inc. and Sierra Agribusiness Insurance Company (hereinafter "Sierra/TMAK.")

14    Amritsar, in turn, issued multiple insurance policies including the subject Policies to the Insured

15    Entities.   The intended purpose of this captive insurance arrangement was to provide multiple

16    insurance coverages to each of the Insured Entities.   Management of all aspects of this captive

17    insurance arrangement including establishing Sierra/TMAK, drafting and issuing policies to the

18    Insured Entities on behalf of Amritsar, and providing actuarial and claims management services on

19    behalf of Amritsar by Amritsar's agent Utah Captive Insurance Managers, LP  ("Utah Captive.")

20            18.    Amritsar issued the Policies for the successive policy periods of December 13, 2017

21    – 2018, December 13, 2018 – 2019 and December 13, 2019 – 2020.  Each of the Policies provides

22    an Each Claim Limit and Aggregate Limit of $250,000.

23            19.    Each of the Insured Entities qualify as an "Insured" under the Policies and each paid

24    a separate premium to qualify as a separate "Insured" under the Policies as evidenced by the

25    certificates of insurance issued to each Insured Entity by Amritsar.  Moreover, as evidenced by the

26    certificates of insurance issued to each of the Insured Entities, the "Tax Audit Expenses" coverage

27    provided by the Policies was not subject to any deductible.

28            20.    Under the Policies' "Insuring Agreements," Amritsar promised to "reimburse an

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

6

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

'Insured' for a 'Loss' to the extent of the 'Limits of Insurance' with respect to an 'Insured Event' occurring within the 'Policy Period," or prior to the 'Policy Period' but on or after the 'Retroactive Date.'" (See Form [01/18/17], Sec.A.1.) Under the Policies, the term "Loss" is defined, in relevant part, as "an amount paid by an 'Insured' with respect to an 'Insured Event.'" (*Id.* Sec.B.17.) The Policies define the term "Insured Event" as "fees and expenses paid by an 'Insured' for professional services provided to such 'Insured' to defend or address an IRS, state or local tax audit against the 'Insured.'"

21.     The Policies provide coverage on a claims-made and reported basis. Under the Policies' "Insuring Agreements," the Policies provide, in relevant part, that "[t]his Policy only applies to any 'Claim' (a) first made against an "insured' during the 'Policy Period," and (b) reported to the 'Insurer' during the 'Policy Period' or 'Claims Reporting Period,' providing that the 'Insured Event' on which the 'Claim' is based first occurred or commenced: a. during the 'Policy Period;' or b. prior to the 'Policy Period' but on or after the "Retroactive Date,' provided that prior to the effective date of the 'Policy Period;' i. an 'Insured' was not aware that the 'Insured's' conduct or lack of conduct constituted an 'Insured Event;' and ii. an 'Insured' did not give notice to any other insurance company, including the 'Insurer,' under a prior or any other policy of the 'potential Claim' or of any 'Insured Event' which might result in a 'Claim.' A 'Claim' shall be considered to be first made when notice of such 'Claim' is received by an 'Insured.'"" (Form [01/18/17], Sec.A.2.) Under the Policies, the term "Claim" is defined as "an IRS, state or local tax 'Audit Notice' against an 'Insured.'" (*Id.*, Sec.B.5.) The term "Audit Notice" is defined by the Policies as "any written notice from a federal, state or local government to the 'Insured.'" (*Id.,* Sec.B.2.)

22.     With respect to the Policies' claim reporting requirements, the Policies' "Insuring Agreements" provide that "[a]n 'Insured' shall give written notice of a 'Claim' to the 'Insurer" by submitting the 'Claim' in compliance with the terms of this Policy." (Form [01/18/17], Sec.A.2.) Under the Policies' "Notice of a 'Claim'" provision, the Policies provide that "[i]f an 'Insured" becomes aware of a 'Potential Claim' and gives the 'Insurer' written notice as soon as practicable during the 'Policy Period' or 'Claims Reporting Period' of the particulars of such 'Potential Claim,' including all facts related to the 'Insured Event,' the identity of the person allegedly involved in or

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

affected by such 'Insured Event,' if any, the dates of any alleged event or relevant facts to evaluate the 'Potential Claim,' and the reasons for anticipating a 'Claim,' any 'Claim' subsequently made against any 'Insured' arising out of such 'Insured Event' will be deemed to have been made during the 'Policy Period.'  Notice to the 'Insurer' and any information furnished to the 'Insurer" shall be given to [Utah Captive at] P.O.Box 339, Park City, UT 84060 or 2750 Rasmussen Road, Suite H-105, Park City, UT 84098." (*Id.*, Sec.G.1.)  Also, under the Policies' "Notice of a 'Potential Claim'" provision, the Policies provide that "[i]f an 'Insured' becomes aware of a 'Potential Claim'" and gives the 'Insurer' written notice as soon as practicable during the 'Policy Period" or "Claims Reporting Period" of the particulars of such 'Potential Claim,' including all facts related to the event, the identity of the person allegedly involved in or affected by such 'Insured Event,' if any, the dates of any alleged event or relevant fact to evaluate the "Potential Claim," and the reasons for anticipating a 'Claim,' any "Claim" subsequently made against any 'Insured' arising out of such 'Insured Event" will be deemed to have been made during the 'Policy Period.'  Notice to the 'Insurer' and any information furnished to the 'Insurer" shall be given to [Utah Captive at]  P.O.Box 339, Park City, UT 84060 or 2750 Rasmussen Road, Suite H-105, Park City, UT 84098." (*Id.*, Sec.G.2.) (Hereinafter Utah Captive Insurance Managers, LP shall be designated as "Utah Captive.") (Hereinafter, the Policies' "Notice of a 'Claim'" and "Notice of a 'Potential Claim'" provisions shall be designated as the "Policies' Notice Requirements.")

### The IRS Audits Of The Insured Entities And Notice Thereof To Active Captive And Amritsar

23.    On or about June, 2018, FreshPac received an IDR1 notice letter from the IRS advising that it had been selected for examination for the tax period ending December 31, 2016. Shortly thereafter, FreshPac received an IDR2 notice from the IRS which advised that the focus of the audit was on the captive insurance structure set up and managed on behalf of Amritsar by Active Captive  (hereinafter the original IDR1 and IDR2 notice letters shall be designated "the Original Audit Notices.")

24.    Shortly thereafter, FreshPac tendered the Original Audit Notices to Active Captive pursuant to the Policies' Notice Requirements.  Based on the date of receipt of the Original Audit

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

8

COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING

Notices in 2018  and the tender of the same to Active Captive, the Original Audit Notices triggered coverage under the Policy providing tax expense reimbursement coverage for the policy period of December 31, 2017 – 2018.

25.     Following tender of the Original Audit Notices to Active Captive, Active Captive on behalf of Amritsar opened an initial claim under the December 31, 2017 – 2018 Policy.  Active Captive's claims department sent a questionnaire to FreshPac to be completed and returned by email. After FreshPac's representatives completed and returned the questionnaire as requested, Active Captive on behalf of Amritsar accepted the tender and opened an active claim under the December 31, 2017 – 2018 Policy.

26.     Shortly thereafter, and after consulting with FreshPac's own CPAs at Wiebe Hinton Hambalek, LLP ("Wiebe") and agents of Active Captive, a consensus emerged that FreshPac would retain independent legal guidance to evaluate the 831(b) captive insurance structure provided to the Insured Entities under the management and guidance of Active Captive and that that same counsel would provide a defense to the Insured Entities in the event of a legal challenge by the IRS.   Based on Active Captive's further recommendation, FreshPac retained the out-of-state law firm of Chamberlain Hrdlicka, Attorneys at Law ("Chamberlain Law.")

27.     In connection with the defense of FreshPac and during consultations between representatives of FreshPac, Active Captive and Chamberlain Law, FreshPac was advised that it should label all communications "attorney client privilege" and route those communications through Chamberlain Law rather than to both Chamberlain Law and Active Captive in order to preserve the confidentiality of deliberations with Chamberlain Law with respect to the defense being provided to FreshPac in connection with the IRS audit.

28.     During the course of the IRS audit and Chamberlain Law's defense thereof, it soon became apparent that the IRS was in the course of auditing and challenging the tax filings by all of the Insured Entities insofar as they were participants in the 831(b) captive insurance program designed and managed by Active Captive.   Among the IRS notice and other documents sent evidencing that the original audit had expanded to include the tax filings of all of the Insured entities including, but were not limited to: (1) an IRS request to extend the period to assess taxes for

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

1   FreshPac for the tax year ending December 31, 2017 which was denied on September 4, 2019; (2)

2   a September 13, 2019 notice from the IRS proposing a resolution on the issue of transactions under

3   the 831(b) captive insurance program for all of the Insured Entities which invited all of the Insured

4   Entities to participate; (3) an October 23, 2019 IRS written notice that it was opening another audit

5   for FreshPac for the tax year ending December 1, 2018; and (4) a December 20, 2019 additional

6   IDR-1 notice for all of the Insured Entities for the tax years ending on December 31, 2017 and

7   December 31, 2018.  All of this documentation was submitted to Chamberlain Law and Active

8   Captive, thereby triggering coverage for each and all of the Insured Entities under all three (3) of

9   the Policies and satisfying the Policies' Notice Requirements. Moreover, all of this documentation

10   and all of the active discussions between representatives for the Insured Entities, Active Captive and

11   Chamberlain Law put Active Captive and Amritsar on notice that the IRS was auditing, investigating

12   and preparing to challenge the entire 831(b) captive insurance program managed by Active Captive

13   and the participation of all of the Insured Entities in that program during the 2016 – 2018 tax years.

14       29.    As part of Active Captive claims handling of the expanded audits, Active Captive

15   advised the Insured Entities that the applicable procedure for receiving benefits under the Policies

16   was for the Insured Entities to first pay the expenses incurred in connection with the audits –

17   including payment of related invoices from Wiebe, Chamberlain Law and others – and then submit

18   the invoices to Active Captive for reimbursement under the Policies.  The Insureds Entities complied

19   with these instructions beginning in 2018 and thereafter.  These invoices, based on their descriptions

20   of the work being performed on behalf of all of the Insured Entities in connection with the expanded

21   audits, further put Active Captive and Amritsar on actual notice that the IRS was auditing,

22   investigating and preparing to challenge all of the Insured Entities' participations in the 831(b)

23   captive insurance program managed by Active Captive during the 2016 – 2018 tax years, thereby

24   further satisfying the Policies' Notice Requirements.

25       30.    As part of the structure and management of the 831(b) captive insurance structure

26   managed by Active Captive, the insuring entities Sierra/TMAK used the same P.O. Box address in

27   Park City, Utah which was used by Active Captive and which also was provided as an addresses to

28   which notice of a "Claim" could be directed under the Policies' Notice Requirements.  Additionally,

MCCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

10

COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING

the IRS sent notices to Sierra/TMAK at the same Park City, Utah, P.O. Box indicating that the audit had been expanded to include the Insured Entities' participation in the 831(b) captive insurance program which included, but were not limited to, written notices on October 3, 2018, December 2, 2018, December 3, 2018, December 23, 2019 and July 15, 2021. Consequently, via Active Captive's receipt of these IRS notices at its Park City P.O. Box which was designated for receipt of a notice of any "Claim" by the terms of the Policies, both Active Captive and Amritsar were put on further notice that the IRS was auditing and challenging the entire 831(b) captive insurance program managed by Active Captive and the participation of all of the Insured Entities in that program during the 2016 – 2018 tax years, further satisfying the Policies' Notice Requirements.

31.     On or about May 13, 2019, Jake Young of Active Captive sent an inquiry via email to Tina Harvey, an employee of the Insured Dayka & Hackett, LLC. In his email, Mr. Young advised that he had been reviewing the invoices and noted that the "audit was opened up to 2017 as well." Mr. Young then requested a copy of the "correspondence … showing when the insured was notified of the expansion[.]"

32.     In response and on that same day, Ms. Harvey sent a copy of an April 16, 2019 fax from IRS revenue agent Charmee Cha advising that the IRS had pending "Information Document Requests" as follows: (1) "IDR #4 Claims – 04/22/2019"; (2) "IDR #5 Communications and IDR #6 Risk Management and Shifting – 05/21/2019"; and (3) "IDR #7 Captive Insurance Deductions and IDR #8 Captive Insurance Ownership – 06/21/2019." Via the same email response, Ms. Harvey advised Mr. Young and Active Captive: "Don't hesitate to let me know if you should need anything else."

33.     Notwithstanding both the May 13, 2019 email exchange between Mr. Young and Ms. Harvey and Active Captive's receipt of documents and other communications indicating that the IRS audit had expanded to all of the Insured Entities' participation in the 831(b) captive insurance program managed by Active Captive during the 2016 – 2018 tax years, at no time did Active Captive or Amritsar request or otherwise advise that any additional documentation or other information was required from the Insured Entities in order to satisfy the Policies' Notice Requirements or otherwise required by Active Captive in order for it to process the invoices

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

1   submitted by the Insureds Parties for reimbursement under the Policies.

2       34.    Additionally, in November of 2021, Deanna Gilpin of Active Captive was served

3   with an IRS summons requiring her to provide testimony and documents in connection with the

4   expanded audits of the 831(b) captive insurance program providing coverage to all of the Insured

5   Entities, thereby further providing Active Captive and Amritsar notice of the expanded audits

6   against all of the Insured Entities during the 2016 – 2018 tax years and further satisfying the Policies'

7   Notice Requirements.

8   **Amritsar's Change In Position And Refusal To Process Any Further Reimbursements**
    **Under The Policies**

9

10      35.    Starting in 2018 and continuing through 2021, the Insureds Entities, as instructed by

11  Active Captive, would incur expenses in connection with the expanded audits for services rendered

12  by Wiebe, Chamberlain Law and others, pay the invoices for those services and then submit the

13  invoices to Active Captive for reimbursement under the Policies.   Active Captive, in turn, processed

14  the invoices for reimbursement back to the Insured Entities without question until such time as a

15  dispute subsequently arose in March, 2022.

16      36.    Notwithstanding all of the invoices and information provided on behalf of the

17  Insureds Entities regarding the expenses incurred and paid by the Insured Entities in connection

18  with the expanded audits, Active Captive on behalf of Amritsar only processed the following

19  reimbursement payments: (1) $25,397.04 issued on October 16, 2019; (2) $24,885.22 issued on May

20  18, 2021; and (3) $96,860.57 issued on December 8, 2021.  Consequently, to date Amritsar has only

21  provided $147,142.83 in reimbursement policy benefits to the Insured Entities under the Policies

22  notwithstanding the Policies' combined, total limits of $750,000.  Moreover, Active Captive on

23  behalf of Amritsar failed to reimburse or otherwise process approximately $180,000 of additional

24  expenses incurred and paid for by the Insured Entities, proof of which was submitted to Active

25  Captive for processing and reimbursement in 2021.

26      37.    In or around the end of 2020, the Insured Entities, in consultation with Active

27  Captive, decided that they would no longer participate in the original 831(b) captive insurance

28  program managed by Active Captive.  Consequently, in 2020 and 2021 the 831(b) captive insurance

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

12

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED**
**COVENANT OF GOOD FAITH AND FAIR DEALING**

1 program was closed down in the normal course of business with Active Captive and its agents

2 handling all aspects of the captive termination.

3       38.    After the Insured Entities withdrawal from the original 831(b) captive insurance

4 program and subsequent personnel "turnover" at Active Captive, Active Captive then "went dark"

5 by both failing to process any further reimbursement of the invoices being submitted for payment

6 under the Policies and also failing to provide any response to communications on behalf of the

7 Insured Entities in violation of the thirty (30) day response deadline provided by UT Admit Code

8 R. 590-190-10(2)-(3).

9       39.    After months of "follow up" by the Insured Entities, on or about March 14, 2022,

10 Susan Jacobson of Active Captive advised the Insured Entities of Amritsar's new coverage position

11 that: (1) only an "initial tax audit notice from the IRS advising that the insured has been selected for

12 examination" for a particular "tax period" would satisfy the Policies' "Claim" definition – even

13 though the expansive language of the Policies' "Claim" definition was in no way so restrictive; (2)

14 only the Original Audit Notices satisfied the Policies' Notice Requirements; (3) all subsequent

15 expansions of the IRS audits were only subject to coverage under the December 31, 2017 – 2018

16 Policy; (3) only expenses pertaining to the audit of FreshPac and not those pertaining to the audits

17 of the other Insured Entities were subject to reimbursement under the December 31, 2017 – 2018

18 policy; and (4) the reporting periods for the Policies had ended.  As such, Active Captive on behalf

19 of Amritsar, for the first time took the position that only FreshPac was entitled to reimbursement for

20 its separate, severable expenses in connection with the expanded audits subject only to the single

21 $250,000 limit provided by the December 31, 2017 – 2018 Policy ("the New Coverage Position.")

22       40.    Additionally and in conjunction with the New Coverage Position, in March of 2022

23 Active Captive, on behalf of Amritsar, for the first time took the positon that the previously

24 submitted invoices could not be processed unless and until such time that FreshPac identified which

25 specific invoiced expenses were solely attributable to the defense of FreshPac in connection with

26 the expanded audits as opposed to the other Insured Entities.  Consequently, Active Captive on

27 behalf of Amritsar refused and continues to refuse to process payment on the approximately

28 $180,000 of invoices documenting expenses incurred and paid for by the Insured Entities in

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

1  connection with the expanded audits, notwithstanding the fact that it is undisputed that the December
2  31, 2017 – 2018 Policy provides a remaining, unpaid limit of $102,857.17.

3      41.    By taking the New Coverage Position in March of 2022 and asserting that FreshPac
4  could not obtain any further reimbursement under the Policies unless and until such time as FreshPac
5  identified which specific invoiced expenses were solely attributable to the defense of FreshPac – an
6  additional requirement nowhere contained in any of the Policies – Active Captive, on behalf of
7  Amritsar, communicated its intent to cease providing any further coverage under the Policies in
8  connection with the expanded audits and  "close the claim our on our end."

9      42.    By taking the New Coverage Position in March of 2022 after FreshPac and the other
10 Insured Entities had fully complied with all of the Policies' Reporting Requirements and Active
11 Captive's express instructions regarding communication to Amritsar and Active Captive, Amritsar
12 through Active Captive has caused resulting prejudice to the Insured Entities by attempting to
13 impose new reporting requirements under the Policies at a time when the claim reporting periods
14 for those policies has purportedly expired.  Furthermore, Amritsar, through Active Captive, has
15 caused the Insured Entities additional prejudice by adopting the New Coverage Position insofar as
16 it has thereby forced the Insureds Entities to incur additional expense in an attempt to obtain benefits
17 due and owing under the Policies including, but not limited to, effectively attempting to force the
18 Insured Entities to act as their own claims handler in connection with the outstanding claims for
19 benefits under the Policies.

20     43.    On or about May 2, 2022, a letter was sent on behalf of the Insured Entities to Deanna
21 Gilpin (Chief Financial Officer), Michael McKahan (Chief Operations Officer) and Susan Jacobson
22 (Chief Claims Officer) of Active Captive.  The May 2, 2022 letter outlined the history of Active
23 Captive's handling of the expanded audits on behalf of Amritsar including some of the many
24 communications to which Active Captive was privy between 2018 through 2021, demonstrating
25 Active Captive's and Amritsar's actual, ongoing notice that the audits had expanded to include all
26 of the Insured Entities for the 2016 – 2019 tax years based on their participation the 831(b) captive
27 insurance program managed by Active Captive.  The May 2, 2022 letter further advised Active
28 Captive and Amritsar that the Insured Entities, as of the date of the letter, had incurred and paid

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

"over $450k in professional fees and only recovered $147k" as reimbursement under the Policies. The May 2, 2022 letter further advised Active Captive that at a "minimum", the Policies "should cover the liabilities incurred beyond the 2016 Fresh Pac limit of $250k e.g. minimum trigger coverage for at least one year for each entity."

44.    On or about August 5, 2022, counsel for Amritsar and Active Captive sent the Insured entities a letter reiterating Amritsar's New Coverage Position that: (1) only the December 17, 2017 – 2018 Policy applied to all of the expanded audits of all of the Insured Entities; (2) only the Original Audit Notices satisfied the Policies' Reporting Requirement; and (3) FreshPac would only receive additional reimbursement if it demonstrated which expenses on the outstanding, unreimbursed invoices were solely attributable to the defense of FreshPac in connection with the expanded audits as opposed to the other Insured Entities.

45.    Due to Amritsar's and Active Captive's repeated and protracted refusal to provide the Insured Entities all benefits due and owing to them under the Policies in connection with the expanded audits, the Insured Entities were compelled to retain coverage counsel in order to secure the outstanding benefits due to them under the Policies.

46.    On September 9, 2022, coverage counsel for the Insured Entities responded in writing to the August 5, 2022 letter from counsel for Amritsar and Active Captive.  In the September 9, 2022 response, counsel for the Insureds Entities pointed out that, given the fact that the term "Claim" was specifically defined by the Policies to include an "Audit Notice" which was broadly defined as "any written notice from a federal, state or local government to the 'Insured'", Amritsar's position that only a "Tax Audit Notice" from the IRS would qualify as a reportable "Claim" under the Policies was a misconstruction of the Policies' actual coverage. The response further summarized the history of the expanded audits and Active Captive's ongoing involvement in those audits – all of which was already known to Amritsar and Active Captive – to show that the Policies' Reporting Requirements had been satisfied for each of the Insured Entities for each of the Policies. Based on this information, September 9, 2022 response letter insisted that: (1) Amritsar and Active Captive withdraw the erroneous New Coverage Position; and (2) process reimbursement of the outstanding invoices in Active Captive's possession "without any further delay."

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

47.    Counsel for Amritsar and Active Captive responded to the September 9, 2022 letter via a subsequent letter dated October 3, 2022.  The October 3, 2022 letter did not take issue with the September 9, 2022 letter's construction of the Policies' operative language or the information provided by the September 9, 2022 letter regarding Active Captive's actual knowledge and involvement in the defense of the expanded audits against all Insured Entities involved in the captive insurance program managed by Active Captive for the 2016-2019 tax years.    Nonetheless, the October 3, 2022 letter reasserted and maintained the New Coverage Position by insisting that the Insured Entities were required to "prove" that they had transmitted additional "written notices" from the IRS to Active Captive during the 2018 – 2019 and/or 2019 – 2020 Policy periods in order to implicate any coverage under those Policies.  Moreover, the October 3, 2022 letter asserted, notwithstanding the long history of Active Captive's active involvement in the actual defense of the audits against the Insured Entities, that based on counsel's "review of the file," counsel had found no "support" for the fact that Active Captive had multiple notices of the expanded audits against all of the Insured Entities for the 2016-2019 tax years.

48.    Counsel for the Insured Entities responded to the October 3, 2022 letter via letter on November 17, 2022.  The November 17, 2022 response pointed out that the October 3, 2022 letter took no issue with the Insured Entities' factual recital regarding the history of the expanded audits against all of the Insureds Entities nor of Active Captive's knowledge and active involvement with the same.  The November 17, 2022 response further pointed out that the October 2, 2022 letter appeared to have "tacitly abandoned" the earlier, erroneous assertion that the Policies' "Claims" language could only apply to an initial "Tax Audit Notice" letter from the IRS.  Rather, since counsel for Amritsar and Active Captive had taken the position that Active Captive had not received adequate "written notice" of a "Claim" with respect to the expanded audits based on counsel's purported "review" of the "file," the November 17, 2022 response requested that Amritsar and Active Captive provide the Insured Entities with a copy of their files so that the Insured Entities could further demonstrate that the Policies' Notice Requirements had been satisfied in connection with the expanded audits against all of the Insured Entities.  Also, given the fact that it was undisputed that its remaining limits were available and applicable to the expenses incurred and paid

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

1   in connection with the expanded audits, the November 17, 2022 response requested that Amritsar

2   and Active Captive process reimbursement of the outstanding invoices in its possession under the

3   2017 – 2018 policy.

4          49.    Counsel for Amritsar and Active Captive did not respond to the November 17, 2022

5   within thirty (30) day response deadline provided by UT Admit Code R. 590-190-10(2)-(3).

6   Consequently, counsel for the Insureds Entities sent a follow-up letter on December 19, 2022.  In

7   addition to forwarding another copy of the prior November 17, 2022 letter for response, the

8   December 19, 2022 letter again reiterated the Insured Entities' demand – which remained

9   outstanding over six (6) months – that Amritsar and Active Captive process the outstanding invoices

10  in their possession for reimbursement under the undisputed, remaining limits of the 2017 – 2018

11  Policy.

12         50.    Counsel for Amritsar and Active Captive finally responded to the Insured Entities'

13  outstanding requests via a response letter dated December 22, 2022.  Significantly, the December

14  22, 2022 did not take issue with the Insureds' numerous assertions that Active Captive had advised

15  the Insureds to label communications regarding the expanded audits as "privileged and confidential"

16  and route them to Active Captive through Chamberlain Law.  Nonetheless, the December 22, 2022

17  letter took the positon that the Insured Entities communications with Active Captive through

18  Chamberlain Law as directed by Active Captive did not satisfy the Policies' Reporting

19  Requirements.  With respect to the Insureds' outstanding demand that Amritsar and Active Captive

20  process the outstanding invoices for reimbursement under the 2017 – 2018 Policy, the December

21  22, 2022 response took the position that no further reimbursements could be made unless and until

22  such time as FreshPac provided documentation or other information demonstrating which expenses

23  on the outstanding, unreimbursed invoices were solely attributable to the defense of FreshPac in

24  connection with the expanded audits as opposed to the other Insured Entities – even though the

25  terms of the Policies contained no such requirement.  Furthermore, the December 22, 2022 response

26  "declined" to provide the Insureds with a copy of Active Captive's claims file even though

27  Amritsar's New Coverage Position was entirely premised on the contention that counsel's "review"

28  of the same file indicated that the only applicable notice of the "Claim" provided to Amritsar and

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

1   Active Captive was the Original Audit Notices.

2       51.    Counsel for Amritsar and Active Captive send another written response dated

3   January 12, 2023. Via this letter, counsel for Amritsar and Active Captive advised that they had,

4   for the first time, "located" the email communications regarding the expanded audits between Jake

5   Young of Active Captive and Tina Harvey on May 13, 2019. Based on these communications newly

6   "located" over ten (10) months after the coverage dispute had first arose, the January 12, 2023 letter

7   advised that "Active Captive has agreed to open a second claim for FreshPac only under the 12/31/18

8   – 12/30/19 policy period" – notwithstanding that the notice provided by Tina Harvey on May 13,

9   2019 made reference to the expanded audits against all of the Insureds Entities which had

10  participated in the captive insurance program which was the subject of the expanded audits.

11  Moreover, and notwithstanding the fact that Active Captive, on behalf of Amritsar, had purportedly

12  opened another claim under the 2018 – 2019 Policy, the January 12, 2023 letter advised that Active

13  Captive, on behalf of Amritsar, would not provide any further reimbursement in connection with

14  the outstanding invoices unless and until FreshPac provided documentation or other information

15  demonstrating which expenses on the outstanding, unreimbursed invoices were solely attributable

16  to the defense of FreshPac in connection with the expanded audits as opposed to the other Insured

17  Entities.

18      52.    Counsel for the Insureds responded via letter on February 7, 2023. Via this response,

19  the Insureds pointed out to Amritsar's and Active Captive's counsel that the Insured Entities' having

20  routed communications regarding the expanded audits to Active Captive through Chamberlain Law

21  as directed by and agreed to by Active Captive both provided actual notice of the expanded audits

22  of the Insured Entities to Active Captive and Amritsar and otherwise satisfied the Policies'

23  Reporting Requirements. The February 7, 2023 response letter further pointed out that the May 19,

24  2019 email communications between representatives of Active Captive and the Insured Entities

25  regarding the expanded audits – which was purportedly "missed" by Active Captive's review of the

26  file materials over the preceding ten (10) months – further demonstrated "that Active Captive was

27  aware that the original audit had 'expanded' into multiple audits of 'all of the entities that

28  participated in the Active Captive designed 831(b) program' based on ongoing communication

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

18

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

between the [Insured Entities], Chamberlain Law and Active Captive." In addition, the February 7, 2023 response letter pointed out that Active Captive had actual knowledge of the expanded audits against all of the Insured Entities in conformity with the Policies' Reporting Requirements as reflected by the IRS notices sent to Sierra/TMAK at the same address provided for notice under the Policies as well as the IRS summons served on Deanna Gilpin of Active Captive requiring her to provide testimony and documents in connection with the expanded audits of all of the Insured Entities participating in the captive insurance program designed and managed by Active Captive. The February 7, 2023 letter concluded by reiterating the Insured Entities' outstanding demand that Active Captive, on behalf of Amritsar, process the outstanding invoices for reimbursement under the Policies.

53.    Counsel for Amritsar and Active Captive responded via a letter dated February 24, 2023. The February 24, 2023 letter did not respond to or otherwise address any of the information or arguments contained in the prior February 7, 2023 response letter or the Insured Entities' other letters. Rather, the February 24, 2023 letter merely: (1) reiterated that no further reimbursement in connection with the outstanding invoices would be provided unless and until FreshPac provided documentation or other information demonstrating which expenses on the outstanding, unreimbursed invoices were solely attributable to the defense of FreshPac in connection with the expanded audits as opposed to the other Insured Entities; and (2) again refused to provide the Insureds with a copy of Active Captive's claims file as requested by the Insureds in an attempt to alleviate the coverage dispute "stand-off" and resolve that dispute informally.

54.    Four days later, counsel for Amritsar and Active Captive sent another letter dated February 28, 2023 to counsel for the Insured Entities. The February 28, 2023 letter did not respond to or otherwise address any of the information or arguments contained in the prior February 7, 2023 response letter or the Insured Entities' other letters. Rather, the February 24, 2023 letter merely reiterated that no further reimbursement in connection with the outstanding invoices would be provided unless and until FreshPac provided documentation or other information demonstrating which expenses on the outstanding, unreimbursed invoices were solely attributable to the defense of FreshPac in connection with the expanded audits as opposed to the other Insured Entities.

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

55.     Consequently, Amritsar and Active Captive, on behalf of Amritsar, have failed to fulfill their outstanding duties to the Insured Entities and provide all benefits due and owing under the Policies in connection with the expanded audits regarding the Insured Entities participation in the Active Captive designed 831(b) program.  Furthermore, the repeated, protracted refusal of Amritsar and Active Captive on behalf of Amritsar to provide all benefits due and owing under the Policies was objectively unreasonable and in breach of Amritsar's obligations of good faith performance to: (1) diligently investigate the facts to determine that the Insured Entities' claims for additional benefits were valid; and (2) thereafter promptly and reasonably provide all benefits due and owing under the Policies.  Moreover, by advising the Insureds Entities to direct communications regarding the expanded audits to Active Captive through Chamberlain Law in order to facilitate the defense of the audits by maintaining attorney-client deliberations and then subsequently taking the position that such communications could not satisfy the Policies' Reporting Requirements after the Policies' reporting periods had ended, Amritsar and Active Captive on behalf of Amritsar have breached their duty of good faith "to 'deal with laymen as laymen and not as experts in the subtleties of law and underwriting' and to refrain from actions that will injure the insured's ability to obtain the benefits of the contract."  *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985) (*citing MFA Mut. Ins. Co. v. Flint,* 574 S.W.2d 718, 720 (Tenn. 1978).)

## FIRST CAUSE OF ACTION

### (Breach of Contract)

56.     The Insureds incorporate by reference all of the preceding allegations as though set forth fully herein.

57.     Amritsar issued the Policies to the Insureds which were in force and in full effect at all relevant times and for which the Insureds paid valuable consideration in order to secure the benefits and protections provided by the Policies in connection with losses and risks associated with events like the audits conducted by the IRS in connection with the Insureds Entities' participation in the 831(b) captive insurance program directed and managed by Active Captive on behalf of the Insured Entities.

58.     Amritsar breached, and continues to breach, the terms of Policies by, *inter alia*, the

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

following acts and/or omissions:

(a)    Failing to pay to the Insured Entities all benefits due and owing to the Insureds in connection with the expanded IRS audits of the 831(b) captive insurance program directed and managed by Active Captive as required by the terms of the Policies and the operative provisions of the Utah Insurance Code and Insurance Regulations;

(b)    Failing to process the Insured Entities' outstanding claims for reimbursement of audit expenses owned to them under the terms of the Policies within the preceding year in violation of the terms of the Policies and the operative provisions of the Utah Insurance Code and Insurance Regulations;

(c)    Unreasonably and in bad faith repeatedly failing and refusing to process any further reimbursements for losses suffered by the Insured Entities in connection with the expanded audits of the 831(b) captive insurance program after such time as the Insureds decided in the regular course of business to no longer participate in the original 831(b) captive insurance program;

(d)    Unreasonably and in bad faith taking the position that the Policies' claims reporting requirements could only be satisfied by an IRS written notice of the initiation of an audit against the Insureds when, in fact, the Policies' operative language imposes no such restrictive requirements.

(e)    Unreasonably and in bad faith taking the position that the FreshPac was only entitled to reimbursement of expenses incurred and paid for in relation to the expanded audits if it provided additional documentation or information demonstrating that said expenses were solely attributable to its defense when, if fact, the Policies' operative language imposes no such restrictive requirements.

(f)    Unreasonably and in bad faith taking the position that Amritsar and its agent Active Captive had no notice that the original FreshPac audit had expanded to include all of the Insured Entities based on their participation in the 831(b) captive insurance program directed and managed by Active Captive when, in fact, Active Captive was well aware of the expansion of the audits because the Original Audit Notices based on: (1) Active

21

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

Captive's ongoing communications with the representatives of the Insured Entities regarding the ongoing defense of the expanded audits including, but not limited to, communications with Chamberlain Law; (2) multiple documents and other information provided by the Insured Entities' representatives to Active Captive during the course of the audits indicating that the audits had expanded to include all of the Insured Entities based on their participation in the 831(b) captive insurance program; (3) multiple written IRS notices regarding the expanded audits directed to Sierra/TMAK at the same mailing address used by Active Captive which was further designated as a mailing address to be used to provide Active Captive and Amritsar notice of "Claims" pursuant to the Policies' Reporting Requirements; and (4) Active Captive's personal participation in the defense of the expanded audits including, but not limited to, providing testimony and documentary evidence in response to IRS subpoenas served on Active Captive and its agents.

(g)    Unreasonably and in bad faith: (1) inducing the Insureds to primarily direct communications regarding the expanded audits to Active Captive through Chamberlain Law in order to preserve the applicable attorney-client privilege between the Insureds and Chamberlain Law in connection with those audits; and subsequently (2) taking the position that those same communications did not satisfy the Policies' Reporting Requirements after such time as the Policies' claim reporting period had expired;

(h)    Maintaining that Active Captive's claim file did not include any notice of a "Claim" in connection with the audits other than the Original Audit Notices when, in fact, the claims file included additional, written notices directly provided by the Insured Entities to Active Captive including, but not limited to the May 19, 2019 email exchange between Jake Young of Active Captive and Tina Harvey, an employee of the Insured Dayka & Hackett, LLC.

(i)    Purportedly opening up an additional claim under the 2018 – 2019 Policy after over ten (10) months of delay, yet still refusing to provide any further reimbursement under the Policies in connection with the outstanding invoices notwithstanding the belated admission that the 2018 – 2019 Policy provided benefits in connection with the expanded

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

audits.

(j)     Taking the position that: (1) Amritsar was only required to provide benefits under the Policies insofar as the Active Captive claims file documented receipt of a written audit notice from the IRS to one or more of the Insureds which was then directly forwarded by the Insured Entities to Active Captive; (2) taking the position that it was the Insureds' burden to show that Active Captive had such written notices in its claim file; (3) also taking the position that the Active Captive claim file reflected that the only such notices received by Active Captive were the Original Audit Notices when, in fact, that was not true; and then (4) further refusing to provide the Insureds with a copy of the claim file in order that they might satisfy their purported burden, even though the claim file is not a privileged record;

(k)     Forcing the Insureds to retain separate coverage counsel at their own expense in order to attempt to obtain all benefits due and owing to them under the Policies;

(l)      Failing to resolve the outstanding coverage disputes and pay all benefits due and owing to the Insureds under the Policies, thereby forcing the Insureds to file this action at their own expense in order to obtain all outstanding benefits due and owing to the Insureds under the Policies for well over a year.

59.     All of the aforementioned conduct constitutes material, unexcused breaches of the Policies by Amritsar.  To the extent any remaining contractual obligations, duties, or conditions are imposed on the Insureds including but not limited to the Policies' Reporting Requirements, those remaining obligations, duties, and conditions have been waived and/or have been excused due to Amritsar's material breaches. After each material breach, the Insureds were thus excused from any further performance under the terms of the Policies.  Moreover, Amritsar, by and through the actions and/or communications by its agent Active Captive, has induced the Insureds to materially change their positon with respect to communications to Amritsar and Active Captive regarding the expanded audits such that Amritsar and Active Captive are thereby in turn estopped from changing their position as to: (1) whether or not the communications to date regarding the expanded audits has satisfied the Policies' Reporting Requirements; and (2) whether or not the Insured entities are required to provide additional documentation or other information segregating the expenses incurred

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

23

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

1   and paid in connection with the expanded audits between each of the Insured Entities in order to

2   obtain any further reimbursement for those expenses under the Policies.  These waiver and estoppel

3   issues arising by way of Active Captive's involvement with the Insureds' defense with respect to

4   the expanded audits both create a presumption that the Insureds were materially prejudiced thereby

5   and further present disputes subject to resolution by jury trial.  *See UMIA Ins., Inc. v. Saltz,* 2022

6   UT 21, ¶¶29-34, 71 (2022)  (insurer's assumption of defense of claim without "act[ing] seasonably

7   in disclaiming liability" provided presumption of prejudice and supported claims of promissory

8   estoppel and waiver subject to resolution by jury).

9       60.    As a direct and proximate result of Amritsar's false, wrongful and unexcused failures

10  to pay the Insureds all benefits due and owing under the Policies, the Insureds have sustained direct

11  damages in the form of additional, consequential economic losses, as well as other foreseeable and

12  incidental damages, in amounts to be determined according to proof at the time of trial, plus interest.

13                        **SECOND CAUSE OF ACTION**

14              **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

15      61.    The Insureds incorporate by reference all of the preceding allegations as though set

16  forth fully herein.

17      62.    In every insurance policy there exists an implied covenant of good faith and fair

18  dealing that the insurance company will not do anything to injure the right of the insured and

19  beneficiaries to receive the full benefit of the policy.

20      63.    Amritsar, by and through its agent Active Captive, has repeatedly breached the duty

21  of good faith and fair dealing it owed each and every Insured Entity under the Policies which each

22  and every Insured Entity has the right to enforce.

23      64.    Amritsar breached its duty of good faith and fair dealing and engaged in bad faith

24  by, *inter alia*, the following acts and/or omissions:

25          (a)    Failing to pay to the Insured Entities all benefits due and owing to the

26          Insureds in connection with the expanded IRS audits of the 831(b) captive insurance program

27          directed and managed by Active Captive as required by the terms of the Policies and the

28          operative provisions of the Utah Insurance Code and Insurance Regulations;

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

24

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

(b)     Failing to process the Insured Entities' outstanding claims for reimbursement of audit expenses owned to them under the terms of the Policies within the preceding year in violation of the terms of the Policies and the operative provisions of the Utah Insurance Code and Insurance Regulations;

(c)     Unreasonably and in bad faith repeatedly failing and refusing to process any further reimbursements for losses suffered by the Insured Entities in connection with the expanded audits of the 831(b) captive insurance program after such time as the Insureds decided in the regular course of business to no longer participate in the original 831(b) captive insurance program;

(d)     Unreasonably and in bad faith taking the position that the Policies' claims reporting requirements could only be satisfied by an IRS written notice of the initiation of an audit against the Insureds when, in fact, the Policies' operative language imposes no such restrictive requirements.

(e)     Unreasonably and in bad faith taking the position that the FreshPac was only entitled to reimbursement of expenses incurred and paid for in relation to the expanded audits if it provided additional documentation or information demonstrating that said expenses were solely attributable to its defense when, if fact, the Policies' operative language imposes no such restrictive requirements.

(f)     Unreasonably and in bad faith taking the position that Amritsar and its agent Active Captive had no notice that the original FreshPac audit had expanded to include all of the Insured Entities based on their participation in the 831(b) captive insurance program directed and managed by Active Captive when, in fact, Active Captive was well aware of the expansion of the audits because the Original Audit Notices based on: (1) Active Captive's ongoing communications with the representatives of the Insured Entities regarding the ongoing defense of the expanded audits including, but not limited to, communications with Chamberlain Law; (2) multiple documents and other information provided by the Insured Entities' representative to Active Captive during the course of the audits indicating that the audits had expanded to include all of the Insured Entities based on their participation

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

in the 831(b) captive insurance program; (3) multiple written IRS notices regarding the expanded audits directed to Sierra/TMAK at the same mailing address used by Active Captive which was further designated as a mailing address to be used to provide Active Captive and Amritsar notice of "Claims" pursuant to the Policies' Reporting Requirements; and (4) Active Captive's personal participation in the defense of the expanded audits including, but not limited to, providing testimony and documentary evidence in response to IRS subpoenas served on Active Captive and its agents.

(g)     Unreasonably and in bad faith: (1) inducing the Insureds to primarily direct communications regarding the expanded audits to Active Captive through Chamberlain Law in order to preserve the applicable attorney-client privilege between the Insureds and Chamberlain Law in connection with those audits; and subsequently (2) taking the position that those same communications did not satisfy the Policies' Reporting Requirements after such time as the Policies' claim reporting period had expired;

(h)     Maintaining that Active Captive's claim file did not include any notice of a "Claim" in connection with the audits other than the Original Audit Notices when, in fact, the claims file included additional, written notices directly provided by the Insured Entities to Active Captive including, but not limited to the May 19, 2019 email exchange between Jake Young of Active Captive and Tina Harvey, an employee of the Insured Dayka & Hackett, LLC.

(i)     Purportedly opening up an additional claim under the 2018 – 2019 Policy after over ten (10) months of delay, yet still refusing to provide any further reimbursement under the Policies in connection with the outstanding invoices notwithstanding the belated admission that the 2018 – 2019 Policy provided benefits in connection with the expanded audits.

(j)     Taking the position that: (1) Amritsar was only required to provide benefits under the Policies insofar as the Active Captive claim file documented receipt of a written audit notice from the IRS to one or more of the Insureds which was then directly forwarded by the Insured Entities to Active Captive; (2) taking the position that it was the Insureds'

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

burden to show that Active Captive had such written notices in its claim file; (3) also taking the position that the Active Captive claim file reflected that the only such notices received by Active Captive were the Original Audit Notices when, in fact, that was not true; and then (4) further refusing to provide the Insureds with a copy of the claim file in order that they might satisfy their purported burden, even though the claims file is not a privileged record;

(k)    Forcing the Insureds to retain separate coverage counsel at their own expense in order to attempt to obtain all benefits due and owing to them under the Policies;

(l)    Failing to resolve the outstanding coverage disputes and pay all benefits due and owing to the Insureds under the Policies, thereby forcing the Insureds to file this action at their own expense in order to obtain all outstanding benefits due and owing to the Insureds under the Policies for well over a year.

65.    As a direct and proximate result of Amritsar's breaches of its duty of good faith and fair dealing, each and all of the Insured Entities have sustained direct damages, as well as other foreseeable and incidental damages, in amounts to be determined according to proof at the time of trial, plus interest.

66.    As a further direct and proximate result of the unreasonable, bad faith conduct of Amritsar, each and all of the Insured Entities were compelled to retain legal counsel to seek benefits and ultimately to institute this litigation to obtain the full and fair benefit of the insurance for which each and every Insured procured and for which they each paid separate, valuable consideration. Thus, Amritsar is liable for that expense, since attorney's fees are an economic loss—damages— proximately caused by Amritsar's bad faith in failure to pay benefits. *See Billings v. Union Bankers Ins. Co.,* 918 P.2d 461, 468 (Utah 1996).

67.    Amritsar failure to comply with Utah Insurance Code and Utah Insurance Regulations with respect to the handling, processing and payment of benefits under the Policies was intended to cause injury and/or was despicable conduct carried out with a willful and conscious disregard of the rights of each and all of the Insureds. Amritsar had knowledge of its obligation to the Insureds under the terms of the Policies, the Utah Insurance Code and Utah Insurance Regulations  but nevertheless willfully chose to withhold benefits.

68.    Amritsar engaged in a course of conduct to further its own economic interests and to retaliate against the Insureds for their withdrawal from the original 831(b) captive insurance program managed by Amritsar's agent, Active Captive.  *See Saltz,* 2022 UT 21, ¶ 59 ("The duty of good faith requires the insurer to 'be as zealous in protecting the interests of its insured as it would in looking after its own.' And it seems clear that an insurer is not zealously protecting an insured's interests if it retaliates against the insured.") (citing *Ammerman v. Farmers Ins. Exch.*, 19 Utah 2d 261, 266, (Utah 1967).)

69.    Amritsar's conduct subjected each and every Insured to cruel and unjust hardship in conscious disregard of their rights and/or was an intentional misrepresentation, deceit or concealment of material facts known to Amritsar and its agent Active Captive with the intent to deprive each and every Insured of property, legal rights or to otherwise cause injury.

70.    Amritsar's conduct constitutes willful and malicious conduct and/or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of the Insured, thereby entitling the Insureds to punitive damages in an amount appropriate to punish or set an example of Amritsar.  *See Amica Mut. Ins. Co. v. Schettler,* 768 P.2d 950, 967 (Utah Ct. App. 1989); *Johnson v. Rogers*, 763 P.2d 771, 774 (Utah 1988).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    For actual damages against Amritsar in excess of $303,000.00 for amounts due and owing in benefits under the Policies plus other consequential and incidental damages according to proof or any other amount as deemed equitable by the Court;

2.    For economic and foreseeable consequential damages against Amritsar for breach of contract;

3.    For economic and consequential damages, tort damages and punitive damages against Amritsar for breach of the implied covenant of good faith and fair dealing;

4.    Attorneys' fees;

5.    For punitive damages against Amritsar as authorized by Utah law;

6.    For costs of suit herein incurred; and

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

28

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

7.    For such other and further relief as the Court may deem just and proper.

Dated:  May 2, 2023                                    McCORMICK, BARSTOW, SHEPPARD,
                                                                       WAYTE & CARRUTH LLP

By: _____
                                                                       James P. Wagoner
                                                                       Lejf E. Knutson
                                                                       Attorneys for Plaintiffs FreshPac, LLC; Dayka &
                                                                       Hackett, LLC; Kool Kountry, LLC; Hackett AG
                                                                       Management, Inc.; Fresh Select, LLC; and TM
                                                                       Diversified Management, Inc. on behalf of Dayka AG
                                                                       Management, Inc.


## DEMAND FOR JURY TRIAL

Plaintiffs FreshPac, LLC; Dayka & Hackett, LLC; Kool Kountry, LLC; Hackett AG
Management, Inc.; Fresh Select, LLC; and TM Diversified Management, Inc. on behalf of Dayka
AG Management, Inc. hereby demand trial by jury.

Dated:  May 2, 2023                                    McCORMICK, BARSTOW, SHEPPARD,
                                                                       WAYTE & CARRUTH LLP

By: _____
                                                                       James P. Wagoner
                                                                       Lejf E. Knutson
                                                                       Attorneys for Plaintiffs FreshPac, LLC; Dayka &
                                                                       Hackett, LLC; Kool Kountry, LLC; Hackett AG
                                                                       Management, Inc.; Fresh Select, LLC; and TM
                                                                       Diversified Management, Inc. on behalf of Dayka AG
                                                                       Management, Inc.

9043708.1

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

**COMPLAINT FOR INSURANCE BREACH OF CONTRACT AND BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**